In re HAWLEY DOWN DRAFT FURNACE CO.

(District Court, E. D. Pennsylvania.    April 8, 1919.)

No. 4521.

BANKRUPTCY ⊜345—PAYMENT OF CLAIMS—PRIORITY—EQUITABLE ASSIGNMENT—WAIVER.

> Where a contractor, who had an order from the bankrupt for the payment of the contract price of the building, drawn on a trust company, which was trustee in disbursing proceeds of first mortgage bonds, part of which were to be used to pay for the building, accepted checks drawn by the bankrupt on proceeds of the bonds paid directly to it, instead of to the trust company, the contractor acquiesced in the mingling of the funds, and cannot claim priority in payment on the ground that its order was an equitable assignment.

In Bankruptcy.   Proceeding against the Hawley Down Draft Furnace Company.   On petition to review a decision of the referee denying the claim of the McClintic Marshall Company for priority in payment from the funds in the hands of the trustee.   Petition dismissed, and order of referee confirmed.

Calvin F. Smith, of Easton, Pa., for petitioner.
Edward J. Fox, of Easton, Pa., for trustee.

DICKINSON, District Judge.   The points presented by the questions involved in this petition for review are best presented through an outline statement of the facts.   The more broadly the substantial facts are stated, the more clearly are these points presented.   We therefore ignore the mere details and give the substantial facts, rather than a strictly accurate statement of what they are.   The case had one of its beginnings in the purpose of the Easton Board of Trade to promote the industrial growth and development of the Easton district by bringing to that locality manufacturing plants which would

---

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

give employment to labor and bring other benefits to the town. To enable the Board of Trade to extend financial aid, if needed, and thereby to attract new enterprises, an arrangement was made with the different financial institutions by which they were to supply the required moneys by the purchase or discount of notes indorsed by a number of financially responsible members of the Board of Trade. This was done through duly constituted attorneys in fact of the members who thus pledged their credit. The ultimate payment of the notes was planned to be met through the sale of bonds secured by a mortgage on the plant of the company or other party to whom the aid was extended.

Another of the beginnings of this cause was in the bringing of the Furnace Company into this Board of Trade plan. The company was established in Chicago. It was proposed to bring their entire plant to Easton. A site for an Easton plant was to be selected, buildings were to be erected thereon and equipped ready for operation, and a mortgage be executed for $50,000 to secure an issue of bonds. The proceeds of this mortgage were apportioned and appropriated to the expense of removal, to cost of the land and the erection of the buildings, to the cost of machinery and other equipment, etc. Definite sums were stated to be applied to several of these purposes, including the land and the erection of the buildings. It was, of course, part of the plan that the mortgage referred to was to be a first lien, and to assure the carrying out of the plan in its integrity (as well as to protect the purchasers of the bonds) estimates were to be made from time to time of what was due those who were entitled to payment, and a number of bonds corresponding to the aggregate sum thus called for were released for sale. The Easton Trust Company was made the trustee in the mortgage, and was to be the disbursing agent, thus further assuring that the bonds issued would be limited to the value of the work actually done, and that the persons entitled to the money thus raised receive it.

To enable the planned disbursement to be made, it was, of course, necessary that the moneys coming from the sale or discount of the notes be turned over to the disbursing agent. The agreement between the Furnace Company and the Board of Trade embodied the essentials of this plan. Before the plan could be put in operation, however, it developed that the Furnace Company had, by its precipitate action, blocked it. This they did by not only entering into a contract with the McClintic Marshall Company (the present petitioner) for the construction of the building, but by having the actual work of construction begun without any provision against the filing of mechanics' liens. In consequence, the mortgage would not be a first lien.

The difficulties thus created were taken to the McClintic Marshall Company, who finally agreed to the plan which the Board of Trade had devised for removing the difficulty. This took the form of an abrogation of the building contract, an agreed obliteration of all which had been done, the recording of the $50,000 mortgage, and the making of a subsequent new contract with a stipulation against the filing of

liens. The McClintic Marshall Company exacted terms, however, as the consideration for this agreement. These terms took the form of an order or direction by the Furnace Company to the Easton Trust Company to pay to the McClintic Marshall Company all moneys becoming due under the agreement between the Furnace Company and the Board of Trade, the payment to be made "out of the funds to be provided in accordance with" that agreement. This order the Trust Company accepted, qualifying its acceptance, however, by defining the fund out of which payment was to be made, by making it clear to what fund the order related. This was done by adding to their acceptance the phrase "as the funds are furnished us by the banks of the city." There was also quite a little correspondence by letters between the McClintic Marshall Company and the different persons interested in and concerned with the transaction, from which the fair inference arises that the McClintic Marshall Company felt that every one concerned, including the agents of the Board of Trade, would do all which could be reasonably expected to be done toward the moneys raised through the efforts of the Board of Trade being applied to the intended purposes.

Being satisfied with these assurances, and resting upon the protection of this order and its acceptance, the McClintic Marshall Company waived its right of lien and permitted the mortgage to become a first lien. If it was in the contemplation of the plan (as it doubtless was) that all moneys raised through what we will call the Board of Trade notes or (for it really comes to that), in other words, the mortgage moneys, should be turned over to and disbursed by the Easton Trust Company, there was a departure from the plan. The plan was followed in respect to the raising of the money, but instead of paying it to the Trust Company, the financial institutions which bought or discounted the notes treated them as belonging to the Furnace Company, to whom the moneys were paid directly, or by placing the moneys to its credit. The result was that all the moneys went into the bank account of the Furnace Company and were checked out by it as its moneys. This practice continued throughout the whole time of the transactions, until the trouble arose in consequence of which the Furnace Company went into bankruptcy.

The referee finds as a fact that the McClintic Marshall Company knew of this departure from the plan (if it was a departure), that checks following this changed plan of procedure were drawn to and accepted by them, and that they acquiesced in and consented to this method of disbursement of the Board of Trade moneys. Without going into the causes of what resulted, the result is that there is a balance of about $2,600 (including interest) due the McClintic Marshall Company remaining unpaid. The latter company then filed in the court of common pleas of Northampton county its bill of complaint, directed principally against the Easton Trust Company, but to which everybody concerned (including the trustee in bankruptcy) was made a party defendant. The cause of action set forth was based upon a statement of the facts above roughly outlined.

The bill was dismissed by the court, and this decree affirmed by the

Supreme Court of the state on appeal. 248 Pa. 584, 94 Atl. 246. We have not been referred to the report of this case, and do not know the precise grounds of the ruling, but it was thus ruled that the plaintiff had no cause of action. The plaintiff in that bill (the present petitioner for a review) then filed with the referee what was in effect a petition in reclamation proceedings, to the end that it might receive preferential payment over the other creditors of the estate, all of whose claims are on a parity with its own, except in the respect of the order given.

The position taken is that the order on the Trust Company operated as an equitable assignment of the Board of Trade fund (or the part thereof which was apportioned to the erection of the building), whereby the McClintic Marshall Company became the owner of the whole fund; that the diversion of this fund to others was in fraud of its rights; that in some way these diverted funds have come into the hands of the trustee in bankruptcy, mixed and commingled with other funds, by which admixture the whole fund belongs to the petitioner; that the ruling of the state court, that the bill of complaint setting up the same title now set up was without equity and gave no cause of action, does not affect the petitioner, because, among other reasons, the state court had no jurisdiction to decree what it was asked to decree.

From this partial and imperfect statement of the claim of the petitioner this much must be admitted: That the ground between it and the successful assertion of its claim bristles with difficulties which are almost innumerable. Counsel for the petitioner is to be commended for the industry and zeal with which he is urging the asserted rights of his client, and the ability with which he has argued its cause. The argument, however, has failed to convince us of any error committed by the referee in rejecting the claim. Any one charged with the duty of opposing this claim upon its merits has no light task in selecting the ground upon which to rely in presenting the defense. It would be an interminable task to urge all which would present themselves.

The learned referee and the experienced counsel for the trustee, in supporting the findings of the referee, have planted the defense upon the proposition (upheld by justified fact findings) that the plan of disbursements which the petitioner now claims to have been in fraud of its rights was a plan adopted, not only without objection on its part, but with its acquiescence and consent, and of which it was a beneficiary. A few of the other defenses may be enumerated.

1. Whatever rights the petitioner has is as assignee of the Furnace Company. Its assignor could not transfer an ownership in more than was owned. What title, legal or equitable, did the Furnace Company have to the $50,000 mortgage fund? When the mortgaged premises had been brought into completed existence (or pro tanto), it became, it is true, the nominal owner of the proceeds of the mortgage; but the fund was earmarked with the names of the real owners, who were those who had done work and supplied materials (among others) toward the erection of the building and its equipment. Some of them are now claimants upon this very fund in preference to whom the

petitioner is demanding payment. It might with plausibility be urged that the petitioner owned that part of the fund which had been appropriated to the erection of the buildings. Just where this would leave the petitioner we do not know. The case is barren, however, of any fact findings which would avail it.

2. The petitioner's title arises wholly out of the order, or the order and its acceptance. We have stated this in the alternative, because mindful of the differentiation made by counsel between the order operating as an assignment and the acceptance operating as an agreement. View it simply as an assignment, of which the Trust Company was being given notice. The Trust Company had the right to ask—indeed, was compelled to ask: "Of what are you giving us notice?" "You claim to own something by virtue of this assignment. What is it you claim to be yours?" "Is it the whole $50,000, or, if not, what part of it?" Certainly the petitioner would be held to the answer it made in any proceeding in which it was asserting equitable rights. The answer it made was that it claimed to own only such funds as were turned over by the banks of the city to the Easton Trust Company. This suggests two other grounds of defense, with the statement of which we will content ourselves.

3. No fund came into existence upon which the assignment could operate, as the banks did not pay over any such moneys.

4. This is the very question raised and decided against the petitioner in the state courts. Whether this is controlling, as res adjudicata, or as establishing the law of this case, as distinguished from what the law might otherwise be found to be, or is persuasive with us as an adjudication of a question of title arising out of the law of the state by the state judicial tribunals, or whether in any way it concludes the petitioner, we do not feel called upon to inquire.

We dispose of the case before us with the comment that we see no justification for reversing the order made by the referee. This conclusion is undisturbed by any finding of what rights of the petitioner may be asserted upon the doctrine of Nesmith v. Drum, 8 Watts & S. (Pa.) 9, 42 Am. Dec. 260, Lewisburg v. Marsh, 91 Pa. 96, Hurley v. Ashbridge, 35 Pa. Super. Ct. 523, Collins' Appeal, 107 Pa. 590, 52 Am. Rep. 479, In re Wilson, 23 Am. Bankr. Rep. 814, 168 Fed. 566, In re Hanna (D. C.) 105 Fed. 587, Peters v. Bain, 133 U. S. 670, 10 Sup. Ct. 354, 33 L. Ed. 696, Thomas v. Taggart, 209 U. S. 385, 28 Sup. Ct. 519, 52 L. Ed. 845, Smith v. Township, 150 Fed. 257, 80 C. C. A. 145, 9 L. R. A. (N. S.) 876, and the other cases to which we have been referred upon the subject of the rights of an equitable assignee of a fund, and his further right to follow it through all its changes of form. We are not concerned here with the rights of such an assignee when he has them, but with the preliminary questions of whether he has any, and whether he waived them, or is estopped from asserting them.

A like comment is called for upon the question of the right of the petitioner to assert its claim after the year, and whether it is concluded by the decree against it, in support of which counsel cites Nauman v. Bradshaw, 193 Fed. 350, 113 C. C. A. 274, Walker v. Phila., 195 Pa.

168, 45 Atl. 657, 78 Am. St. Rep. 801, Pugh v. Loisel, 219 Fed. 417, 135 C. C. A. 221, Goodnow v. Stryker, 62 Iowa, 221, 14 N. W. 345, 17 N. W. 506, Clark v. Kittenplan, 63 Misc. Rep. 122, 118 N. Y. Supp. 404, together with other cases.

As already observed, the discussion of the merits of every answer to this claim which suggests itself would be well-nigh endless. The short method of dealing with it is at the threshold. The petitioner must show an equity. In this it has failed. If, in addition, it has lost all rights which it may have had, and has already had its day in court, and had decided the very question it is now seeking to again raise, we are merely multiplying answers to the claim, any one of which is a good answer.

The petition for review is dismissed, and the findings and order of the referee approved and confirmed.